## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re:                                                      )
                                                            )   Case No. 07-22719 MER
PETITION OF ERNST & YOUNG, INC., as                         )
Receiver of Klytie's Developments, Inc.,                    )
Klytie's Developments, LLC, Efrat                           )
Friedman, and Hidai Friedman,                               )
                                                            )   Chapter 15
        Debtors in a Foreign Proceeding.       )

## ORDER

THIS MATTER comes before the Court on the Petition of Ernst & Young, Inc. for Recognition of Foreign Main Proceeding Pursuant to Sections 1515 and 1517 of the Bankruptcy Code (the "Petition"), and the Responses thereto filed by the Securities Commissioner for the State of Colorado (the "Commissioner") and certain parties to United States District Court for the District of Colorado Civil Action No. 07-CV-1318-WDM-BNB (the "Severino Plaintiffs"). The Court has considered the evidence and legal argument presented by the parties and hereby makes the following findings of fact and conclusions of law.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and (b) and 1334(a) and (b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(P), as it concerns recognition of foreign proceedings under Chapter 15 of Title 11.

## BACKGROUND FACTS

The background facts stated herein are taken from the Petition, the Affidavit of Craig Munro with Exhibits (the "Munro Affidavit"),[1] the direct testimony received from Craig Munro ("Munro") at the hearing on the Petition, and other exhibits admitted at the same hearing.

Efrat and Hidai Friedman (collectively the "Friedmans") are Israeli citizens who lived in Canada and now reside in California. *Petitioner Exhibit 3,* p. 4. On March 8, 2005, the Friedmans formed Klytie's Developments, Inc. ("KDI") under the laws of Canada, which entity maintained its registered office in Calgary, Alberta. *Id.* The Friedmans own 80% of KDI's stock and the remaining 20% is owned by Jason Sharkey ("Sharkey"), a resident of Denver, Colorado. *Id.* In July, 2005, KDI formed and registered Klytie's Developments, LLC ("KD/CO") in Colorado. *Id.* Sharkey was responsible for the operation of KD/CO under the supervision and direction of the Friedmans. *Petitioner Exhibit 20.*

---

[1] Although the Munro Affidavit was not admitted as evidence because Mr. Munro testified personally, the Court notes much of the information contained in the Munro Affidavit and its exhibits is substantially the same as Mr. Munro's testimony and the exhibits admitted by stipulation at the hearing.

Through KDI and KD/CO, the Friedmans and Sharkey solicited investments in a fund to finance the purchase of real estate developments and holdings throughout the world. These real estate developments and holdings would serve as the assets of the investment fund. Investors in the fund were told they would receive, through shared profits, a minimum annual return on their investment. As a key part of its sales efforts, KD/CO used a prospectus drafted and created by the Friedmans and KDI. *Petitioner Exhibits 18 and 19.*

It is alleged approximately $7.6 million was raised through investors located in the United States, Canada and Israel. *Petitioner Exhibit 3*, p. 5. According to the Commissioner, approximately 88% of the investment proceeds were paid into KD/CO. *Commissioner's Response and Supplemental Trial Brief,* Exhibit 2. The monies raised by KD/CO were deposited in United States banks and a significant portion of these funds were subsequently transferred to KDI and/or the Friedmans. *Petitioner Exhibits 17 and 20.*

In early 2006, the Commissioner initiated an investigation of KDI and KD/CO, and forwarded documents from his investigation to the Alberta Securities Commission ("ASC"), which then commenced its own investigation in Canada. *Petitioner Exhibit 3,* p. 6. On October 23, 2006, the Commissioner filed a Complaint against the Friedmans, KDI, KD/CO, and Sharkey in the District Court for the City and County of Denver, Colorado (the "Colorado Court"). *Petitioner Exhibit 21.* On November 3, 2006, the Colorado Court entered an Order enjoining the defendants in that action from selling interests in the fund, and from brokering, dealing, or selling securities in Colorado. The defendants were also prohibited from dissipating assets or destroying records of KDI or KD/CO. *Petition*, Exhibit B.[2]

The ASC also initiated an action against KDI and the Friedmans, and obtained an Order on October 5, 2006, freezing all monies in their accounts located at the Toronto Dominion Bank of Canada and Royal Bank of Canada. *Petitioner Exhibit 3*, p. 6. On June 5, 2007, the ASC and the Friedmans entered into a settlement agreement under which KDI and the Friedmans admitted to committing fraud, agreed to pay ASC $220,000 (Can.), and agreed to refrain from work in the securities field for 25 years. *Petitioner Exhibit 4.*

On June 22, 2007, the Severino Plaintiffs filed a Complaint against KDI, KD/CO, the Friedmans and Sharkey in the United States District Court for the District of Colorado (the "Federal Court Action"). The Complaint asserted claims for fraudulent sale of unregistered securities, deceit, false representation, and violation of Colorado securities laws. *Petitioner Exhibit 22.* The defendants in the Federal Court Action have moved to stay that case based on the legal proceedings in Canada and based on pending criminal indictments against Hidai Friedman and Sharkey which were entered by the Grand Jury in Jefferson County, Colorado, on October 19, 2007. *Petitioner Exhibits 23 and 24.*

On August 16, 2007, the Court of Queen's Bench of Alberta, District of Calgary (the "Canadian Court"), entered an Order appointing Ernst & Young, Inc. ("Ernst & Young") as receiver for KDI (the "Receiver"). *Petitioner Exhibit 1.* Two months later, the Canadian Court expanded the coverage of its previous order to include the Friedmans and related entities, including KD/CO. *Petitioner Exhibit 2.* The Canadian Court's Orders (i) authorized the Receiver to manage

---

[2] The Court notes although the parties referred to this Order at the hearing in this matter and appeared to be in consensus as to its contents, no copy of this Order was submitted to this Court.

and operate the businesses affected, collect accounts receivable, and to pursue all legal proceedings relating to KDI and related entities; (ii) stayed all legal proceedings involving KDI and enjoined persons other than the Receiver from dealing with property of KDI and its related entities; (iii) required knowledgeable persons to cooperate with the Receiver; and (iv) authorized the Receiver to seek recognition of its orders and to seek "aid and recognition" of courts in the United States. *Petitioner Exhibits 1 and 2*.

The Petition alleges the Alberta receivership proceeding is a collective judicial proceeding arising under the common law of Canada and the United Kingdom relating to insolvency (the "Receivership Proceeding"). It states the Receivership Proceeding constitutes a "foreign main proceeding" under 11 U.S.C. §§ 101(23) and 1502(4)³ because KDI was incorporated in Alberta, Canada under the Alberta Business Corporations Act, because the operations of KDI and KD/CO were conducted primarily from Calgary, Alberta, Canada and because the principal assets of KDI and KD/CO are located in Alberta. Further, the Petition states recognition as a foreign main proceeding is necessary to assist the Receiver in investigating and pursuing assets of KDI and its related entities located in Colorado and elsewhere in the United States. Alternatively, the Petition asserts the Receivership Proceeding is a "foreign nonmain proceeding" under § 1502(5).

## DISCUSSION

Chapter 15 of the Bankruptcy Code was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Chapter 15 essentially implements the Model Law on Cross-Border Insolvency promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"). *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007) (*citing* H.R.Rep. No. 109-31 at 105-07 (2005), U.S.Code Cong. & Admin. News (2005 p. 88)); *In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 631-32 (Bankr. E.D. Cal. 2006). Chapter 15 was included in BAPCPA to facilitate cooperation between United States courts, trustees, examiners, debtors and debtors-in-possession and the courts and other competent authorities of foreign countries; to provide greater consistency in the law for trade and investment; and to promote fair and efficient administration of cross-border insolvencies while protecting the interests of all creditors and other interested parties, including the debtor. *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).

Pursuant to § 1504, a case under Chapter 15 is commenced by a foreign representative filing a petition for recognition of a foreign proceeding under § 1515. The petition for recognition must be accompanied by evidentiary documents which are presumed to be authentic in the absence of evidence to the contrary. *See* 11 U.S.C. §§ 1515(b) and 1516(b). A foreign representative may request recognition of the foreign proceeding as either a "foreign main proceeding" or a "foreign nonmain proceeding." 11 U.S.C. § 1517(a)(1).

Section 1502(4) defines a foreign main proceeding as a "foreign proceeding pending in the country where the debtor has the *center of its main interests*" ("COMI") (emphasis added). 11 U.S.C. § 1502(4); *see In re Petition of Lloyd*, 2005 WL 3764946, at *2 (Bankr. S.D.N.Y. 2005) (granting recognition of foreign main proceeding). A foreign nonmain proceeding is defined as any other proceeding "pending in a country where the debtor has an establishment." 11 U.S.C.

---

³ Unless otherwise noted, all future statutory references in the text are to title 11 of the United States Code.

§ 1502(5). An "establishment" means "any place of operations where the debtor carries out a nontransitory economic activity." 11 U.S.C. § 1502(2).

Under § 1516(c), "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests." The legislative history of § 1516 indicates "the presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy." H.R.Rep. No. 31, 109th Cong., 1st Sess 1516 (2005), U.S. Code Cong. & Admin. News 2005, pp. 88, 175. The *Tri-Continental* Court found the debtor's COMI comparable to the concept of "principal place of business" under United States law. *Tri-Continental*, 349 B.R. at 633-34.

In *Bear Stearns*, Judge Lifland set forth the following analysis of the COMI presumption:

> As noted by the European Court of Justice, the COMI presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated." *See In re Eurofood IFSC Ltd.*, *supra* at ¶ 35; *see also In re SPhinX, Ltd.*, 371 B.R. 10 (S.D.N.Y.2007). In addition, the Guide explains that the presumption does "not prevent, in accordance with applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court or an interested party." See Guide ¶ 122.

*Bear Stearns*, 374 B.R. at 129 (citing to the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency).

In the Petition before the Court, the objecting parties do not dispute Ernst & Young is the Receiver appointed in the Receivership Proceeding, and is a foreign representative pursuant to § 101(24).[4] Nor do they dispute the Receivership Proceeding is a foreign proceeding as defined in § 101(23).[5] In addition, the Court finds Ernst & Young, as a foreign representative, constitutes a "person" under § 101(41).[6] KDI, KD/CO, and the Friedmans are debtors under § 1502(1).[7]

---

[4] A "foreign representative" under § 101(24) is:

a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

[5] A "foreign proceeding" under § 101(23) is:

a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

[6] A "person" under § 101(41) includes an "individual, partnership, and corporation . . ."

[7] Section 1502(1) defines a "debtor" as "an entity that is the subject of a foreign proceeding."

However, the Commissioner asserts this action stems from multi-national cross-border securities fraud perpetrated by primarily KD/CO, through Sharkey, a Denver resident, and thus disputes Canada is the appropriate COMI. The Commissioner contends the Debtors' COMI is where the fraud occurred and, since KD/CO was the entity primarily responsible for the fraud, and because the monies from investors flowed through KD/CO and through banks in the United States, the Debtors' COMI is Colorado.

The Commissioner also asserts recognition of the Receivership Proceeding as a foreign main proceeding would be contrary to public policy and would result in harm to the recovery efforts already commenced here in Colorado.[8]  He further asserts the factors set forth in § 1507 weigh in favor of not granting the recognition of the proceeding, or at least modifying any recognition order to protect the public interest.  Finally, the Commissioner alleges the Receivership Proceeding will not provide relief against all parties, because neither the Receivership Proceeding nor the Chapter 15 Petition include Sharkey as a party.

The Severino Plaintiffs also dispute the assertion the Debtors' COMI is Canada, noting the Receivership Proceeding was instituted by the petition of Israeli investors and not by Canadian or United States investors.  They further contend declaring the Receivership Proceeding a foreign main proceeding may allow the Receiver to obtain the funds being held by the Colorado Court and distribute those funds pursuant to Canadian law to the detriment of the Severino Plaintiffs' rights. They assert there has been no determination in the Receivership Proceeding as to whether there will be one common fund or several funds set up for distribution to creditors of KDI and KD/CO. They also raise the concern the Receiver's cost of pursuing assets will exceed any claims held by creditors located in the United States.

Based on the parties' respective arguments, the Court must determine whether the foreign proceeding, *i.e.*, the Receivership Proceeding, is "in the country where the debtor has the center of its main interests," and whether recognition would be "manifestly contrary to the public policy of the United States" under § 1506.

## A.    Center of Main Interests

The Bankruptcy Code does not define "center of main interests."  However, as noted above, the place where the debtor has its registered office is presumed to be the center of the debtor's main interests under § 1516(c).[9]  Each of the small number of cases addressing the COMI dilemma offers insight into the determination of this key issue.  However, the determination of the issue is necessarily fact driven in each particular case.

The bankruptcy court's decision in *SPhinX* involved a debtor in a Cayman Islands liquidation case.  The debtor had its registered office in the Cayman Islands, but was not authorized

---

[8]  As a result of the Commissioner's efforts, it appears approximately $465,000 is being held by the Colorado Court.  *See Petitioner Exhibit 3*, p.6, ¶17 (indicating the Colorado Court's order of November 3, 2006 froze bank accounts in Colorado); *see also Petitioner Exhibit 21*, ¶12 (The Complaint alleges $200,000 located at Guaranty Bank and Trust and $265,000 at U.S.Bank.  Both banks are located in Denver, Colorado).

[9]  Bankruptcy Judge Drain determined this presumption might not be helpful in the case of a serious dispute about where a debtor has its main interests, and found the presumption could be rebutted.  *SPhinX,* 351 B.R. at 117 (*citing* H.R. Rep. No. 109-31, pt. 1, at 112-113 (2005), U.S. Code Cong. & Admin. News 2005, pp. 88, 174-176).

to do business in that locale. Rather, all of its assets and business operations were located in the United States. The bankruptcy court found the debtor and its creditors sought recognition of the Cayman Islands liquidation as a foreign main proceeding as a litigation tactic--to obtain the automatic stay to defeat a settlement, and that the liquidators were forum shopping. Based upon those facts, the bankruptcy court declined to recognize the Cayman Islands case as a "foreign main proceeding," but determined no harm would result from recognizing the case as a "foreign nonmain proceeding," subject to later modification pursuant to the provisions of § 1517(d).[10]  *SPhinX*, 351 B.R. at 117.

In *Tri-Continental*, the bankruptcy court determined the debtor's COMI was St. Vincent and the Grenadines because it was organized under the law of that jurisdiction, and conducted regular business at offices located there. *Tri-Continental*, 349 B.R. at 635. In reaching its conclusion, the *Tri-Continental* Court relied upon § 1508, which requires the COMI analysis to be consistent with the interpretation of similar statutes in foreign jurisdictions. *Id*. The Court stated:

> In the European Union, the broadest grant of jurisdiction is to the courts of the Member state, where the "centre of a debtor's main interests is situated." In the regulation adopting the EU Convention, the concept is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

*Id.* at 634 (footnotes omitted).

More recently, in *Bear Stearns,* Judge Lifland stated the mere fact the subject debtors were organized under the laws of a certain locale (in that case, the Cayman Islands), did not mean that locale was the COMI for Chapter 15 purposes. *Bear Stearns*, 374 B.R. at 128. He found the evidence before him established the debtors' activity was actually centered in New York. *Id.* at 129. Moreover, Judge Lifland determined there was really no "establishment" in the Cayman Islands – that is, no "nontransitory economic activity" under § 1502(5). Specifically, in addition to having no employees or managers located outside New York, all business conducted by the debtors in the Cayman Islands was related to their New York operation. Hence, no "nontransitory" activity existed. *Id.* at 131. As a result, the foreign proceeding was not eligible for relief as a foreign main or a nonmain proceeding. *Id.* at 132. As part of his analysis, Judge Lifland identified several other factors that may be helpful in determining a debtor's COMI, including: (1) the location of those who manage the debtor; (2) the location of the debtor; (3) the location of the debtor's primary assets; (4) the location of the majority of the debtor's creditors or the majority of creditors affected by the case; and (5) the jurisdiction whose law would apply to most disputes. *Id.* at 128.

---

[10]  In affirming the Bankruptcy Court's decision, the Federal District Court for the Southern District of New York stated:

> Such circumstances as this support denial of recognition as a foreign main proceeding on the ground that the recognition is being sought for an improper purpose. *See, e.g., Baker v. Latham Sparrowbush Assocs.*, 931 F.2d 222, 228 (2d Cir.1991) (finding that an entity may not file a Chapter 11 petition "which is solely designed to attack a judgment collaterally"); *In re Rimsat, Ltd.*, 98 F.3d 956, 962 (7th Cir.1996) (declining to defer to a foreign proceeding as "instituted in an effort to defeat" a U.S. bankruptcy proceeding and "strategic conduct that is not to be encouraged").

*In re SPhinX, Ltd*, 371 B.R. 10, 18 (S.D.N.Y.  2007).

In the instant case, the COMI determination is complicated because there is a lack of clarity as to the identity of the Debtor(s) in the Receivership Proceeding. Originally, the only entity subject to the receivership was KDI. It was the subsequent Order of the Canadian Court expanding the receivership to include KD/CO which has created the confusion. For COMI purposes, should each of these entities be evaluated separately? Should there be an evaluation similar to a "piercing the corporate veil" analysis so as to determine whether there are two separate and distinct entities? Does the issue of control of the entities come into play, and if so, to what extent?

The factors set forth in *Bear Stearns* offer a useful analytical framework to determine the above issues. The first factor indicates the Court should determine the location of those who manage the debtor. Herein, the evidence establishes the driving force behind both entities was the Friedmans. Although the Friedmans now live in the United States, they formed their fraudulent organization(s) and directed the operations of KDI and KD/CO (at least indirectly, through Sharkey) from Canada.[11]

The second *Bear Stearns* factor - the location of the debtor, is not critical in this case because there was no real business being operated out of either entity. Rather, the creation of both KDI and KD/CO was part of a fraudulent scheme.

Of greater importance to the analysis is the third *Bear Stearns* factor - the location of the principal assets of each entity. According to the evidence presented, as part of the fraudulent scheme, investors were told they were investing in a private real estate fund known as Klytie's Developments, Inc. Global Real Estate Fund. Several parcels of real property were purchased with some of the investors' contributions; however, it is unclear under what name these properties were held. For purposes of the present analysis, it does not appear any of the purchased real estate was held in the name of KD/CO, but rather, in the name of KDI. In fact, the only assets of KD/CO appear to be the monies tendered by investors which were deposited into the KD/CO account at Guaranty Bank and Trust and U.S. Bank (the "Colorado Accounts"). As of the date of the hearing on the Petition, a total of $465,000 remains in the Colorado Accounts, which were frozen as part of the Commissioner's action brought in the Colorado Court. *See supra, note 8.* The testimony of Sharkey, provided through a sworn statement as part of the Commissioner's investigation, indicates the monies deposited in the Colorado Accounts were regularly transferred to KDI or related

---

[11]  Mr. Friedman's control of the business from Canada is supported by *Petitioner Exhibit 20*, the Sworn Statement of Jason Sharkey, illustrated by the following excerpts:

–page 25, lines 1–13 (Sharkey checked Mr. Friedman's history with the ASC and later traveled to Calgary, where Mr. Friedman showed him properties alleged to belong to KDI)
–page 85, lines 14-18 (indicating the sales power point for solicitation to investors was created by Mr. Friedman)
–page 101, lines 11-13 (all information was provided to Sharkey by Mr. Friedman)
–page 112, lines 1-12 (Mr. Friedman provided all prospectuses to be used by Sharkey)

entities.[12]  Thus, the available evidence shows the majority of assets involved were in the name of or ultimately controlled by KDI in Canada.

The final two *Bear Stearns* factors (location of the majority of the debtor's creditors and the jurisdiction whose law would apply to most disputes) are not critical to the COMI determination in this case.  The investors defrauded by the Friedmans and their entities were citizens of several countries, including Canada, the United States and Israel.  As for applicable law, jurisdiction lies equally in Canada and the United States.

Although not clearly enunciated as such in the Bankruptcy Code, the recognition determination appears to be a summary determination.  As a result, a full and final adjudication of *alter ego* and corporate governance issues does not need to be completed.  While not making a final determination on the issue, the Court finds, based on the evidence presented, there is a reasonable probability KDI and KD/CO were operated as one for purposes of perpetrating a fraud on investors.  Should it be determined in the Receivership Proceeding that KDI and KD/CO are two independent entities which should be liquidated separately, Chapter 15 of the Bankruptcy Code allows the recognition determination to be modified or terminated in the future.  *See* 11 U.S.C. § 1517(d).

## B.    Public Policy

The remaining issue is whether recognition of the Petition would be "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The legislative history to Chapter 15 indicates this exception is to be applied narrowly, and should be invoked only when the most fundamental policies of the United States are at risk.  *See* H.R. Rep. No. 109-31 at 109 (2005), reprinted in U.S.C.C.A.N. 88, 172; *see also In re Ephedra Products Liability Litigation*, 349 B.R. 333, 336-337 (S.D.N.Y. 2006) (the inability to have a jury trial in Canada, where one would be allowed in the United States, was not "manifestly contrary to the public policy of the United States").

Here, the objecting parties' arguments are twofold.  Initially, they contend Colorado investors (or more broadly, United States investors) may receive less in the Receivership Proceeding, which will include creditors from Canada and Israel, than what these "local" investors would receive from the Colorado Court or the Federal Court.  However, the Court finds this argument unpersuasive.  All wronged investors should share in the assets accumulated in the Receivership Proceeding, regardless of nationality or locale.

Second, the objecting parties argue the costs attendant to the Receivership Proceeding will deplete the assets of KDI and KD/CO to such a degree that distributions to the wronged investors will be minimal.  However, other than pointing out the Receiver is an international firm, the

---

[12]   The following excerpts are illustrative of the money transfer process:

-page 34, lines 5-19 (reason why KD/CO was created and when funds transferred between entities)
–page 132, lines 20-24 (funds sent from Israel were received by KDI and later forwarded to Canada at Mr. Friedman's direction)
–page 189, lines 8-17 (the ultimate responsibility for all funds in the operation was Mr. Friedman's)

objecting parties provided no evidence to support this allegation.[13]  Costs of liquidation are a reality, whether through a foreign proceeding, or through a United States bankruptcy case. Accordingly, the Court finds this public policy argument equally unpersuasive.  As a result, the Court can find no evidence at this time to support a finding that the Receivership Proceeding will produce a result so drastically different to be "manifestly contrary" to United States public policy.

## CONCLUSION

For the above reasons,

IT IS HEREBY ORDERED the Petition meets the requirements of 11 U.S.C. § 1515 and the Receivership Proceeding is hereby recognized as a foreign main proceeding within the meaning of 11 U.S.C. § 1502(4), with Ernst & Young as the foreign representative.

IT IS FURTHER ORDERED that, on or before May 1, 2008, the Receiver shall file a status report with the Court containing the results of its investigations, after which the Court may set a status hearing, if necessary.

Dated February 8, 2008

BY THE COURT

Michael E. Romero
United States Bankruptcy Judge

---

[13]  The Court notes Mr. Munro testified at the recognition hearing the Receiver had to date incurred approximately $300,000 in fees and costs.  No further testimony was presented on this issue.